tribution from the ship owner for a loss by jettison. Gould v. Oliver, 4 Bing. N. C. 134, and Johnson v. Chapman, 19 C. B. (N. S.) 563 (19 J. Scott, N. S.) in England, and Vernard v. Hudson [Case No. 16,921]; The Delaware, 14 Wall. [81 U. S.] 602; and The Watchful [Case No. 17,250],—in this country; afford strong support to the doctrine or principle last stated, and I should be inclined to follow these authorities, rather than the others, if the present case did not show such laches on the part of the libellants, in enforcing their claim, that they ought not now be allowed to prevail against a mortgagee, whose debt was a maritime lien before he waived it for the mortgage security. Beawes, in his Lex Mercatoria, in discussing the duties of parties claiming an average contribution for the loss of goods thrown overboard in a storm, warns them "to take care to have the loss valued before the ship's discharge, in which the master ought to assist and settle all averages before he unloads." Beawes, 159. The decision of the court of king's bench in Simonds v. White, 2 Barn. & C. 805, that the adjustment of the average should be made according to the law of the place of the ship's destination, on delivery of the cargo, is based upon the fact that whether the loss falls upon the owner of the vessel, or upon other shippers, it is the duty of the captain to retain control of the cargo until the average is ascertained and paid, and see 11 Johns. 323. The first jettison was in October, and the second early in November, 1877. The schooner was employed wholly by the libellants at the time in transporting freight and merchandise to and from the port of Millville. She continued in their employ and made several trips after the loss. Although the libellants had frequent opportunities of proceeding against the vessel, they refrained from taking any steps to enforce an average contribution for several months, and did not file a libel until after other parties having maritime liens arrested the vessel.

It would seem from the testimony of Mr. Cranshaw, the general manager of the libellants, that some arrangement was entered into between the captain, as owner, and Mr. Walter Wood, one of the libellants, by which proceedings against the vessel were waived or postponed, and also against the captain, who it is said "promised to make all right, and who wanted the delay, as he was hard up for the cash." The schooner was purchased at the marshal's sale by the libellants, who retained the captain for a while as master. He was not made a witness in the case, and has now disappeared from the scene, quite willing, doubtless, to be relieved from the personal responsibility which he had assumed, and to have his debt paid from the proceeds of the vessel, in which he has no further interest. I think it would be inequitable to allow the libellants, in view of other facts, to maintain their lien and take these proceeds from a bona fide mortgage creditor whose claim largely exceeds the remnants in the registry, after the payment of prior admiralty liens. The libel must be dismissed with costs.

---

## Case No. 17,963.
### WOODS v. SANDS.

[This was a suit by Enoch Woods against Obidiah Sands in the circuit court of Cook county, Ill., although sometimes cited as a federal case. See Codd. Trade-Marks, 50; Cox, Manual Trade-Mark Cas. 264.]

---

WOOD (SCHRIEFER v.). See Case No. 12,-481.

WOOD (TAYLOR v.). See Case No. 13,808.

WOOD (TRACY v.). See Case No. 14,130.

WOOD (TROTT v.). See Case No. 14,190.

WOOD v. UNION IRON WORKS CO. See Case No. 17,941.

WOOD (UNITED STATES v.). See Cases Nos. 16,751–16,757.

---

## Case No. 17,964.
### WOOD v. VAN HOOK.

[Nowhere reported; opinion not now accessible.]

---

WOOD (VAN HOOK v.). See Cases Nos. 16,-854 and 16,855.

---

## Case No. 17,965.
### WOOD v. WARD.

[24 Int. Rev. Rec. 180; 6 Am. Law Rec. 675.]

Circuit Court, S. D. Ohio. April Term, 1878.

SLAVERY—PRESUMPTION OF FREEDOM—STATUTE OF LIMITATIONS — ABSENCE FROM STATE — DURESS—RES JUDICATA.

[1. Freedom, being the natural right of man, and the constitution of Ohio declaring that all men are born equally free, and that servitude shall not exist in the state, the presumption is that a person who has for several years resided in Ohio is free.]

[2. Where a cause of action arose in Ohio, and immediately afterwards plaintiff, while temporarily in another state, was seized and imprisoned, sold into slavery, and carried into another state, *held*, that if, upon emancipation, she returned to Ohio as soon as she could, and if, during her absence, she did not reside in the same states with the defendant, the statute of limitations did not commence to run against her until her return to the state.]

[3. Under the Ohio statute, if, when a cause of action accrues against a person, he is out of the state, the period of limitation does not begin to run until he comes into the state.]

[4. In order to set the statute to running in favor of a defendant, who was out of the state when the cause of action accrued, his coming into the state must either be of a permanent character, or, if not so, it must be brought to plaintiff's knowledge; or, if not, then his stay must be of such a nature that plaintiff by ordinary reasonable diligence can ascertain it.]